IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CLAYLAND FARM ENTERPRISES,     :
LLC,

                             :

     Plaintiff,

                             :         Civil Action No. GLR-14-3412

v.

                             :

TALBOT COUNTY, MARYLAND, et al.,

                             :

     Defendants.

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on Plaintiff Clayland Farm Enterprises, LLC's ("Clayland") Motion for Partial Summary Judgment (ECF No. 148) and Defendants Talbot County (the "County"), Talbot County Planning and Zoning Commission, Talbot County Department of Public Works Advisory Board (the "Advisory Board"), Thomas Hughes, Michael Sullivan, John Wolfe, and Jack Fisher's Motion for Summary Judgment (ECF No. 156). This local zoning dispute arises out of three Talbot County Bills—Bill Nos. 1214, 1257, and 1229—two of which functioned as moratoria, and one of which adopted a tier map aimed at minimizing the environmental impacts of subdivision and sewer system expansion. The Motions are ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will deny Clayland's Motion and grant in part and deny as moot in part Defendants' Motion.

# I.    BACKGROUND[1]

## A.    Factual Background

### 1.    The Property

Clayland owns a 106.37-acre, waterfront property in the Village of Royal Oak in Talbot County, Maryland (the "Property"). (Compl. ¶ 28, ECF No. 2; Pl.'s Mot. Partial Summ. J. ["Pl.'s Mot."] Ex. 1 ["Map"], ECF No. 148-3). The Property consists of seven smaller plots and one larger plot. (Defs.' Mot. Summ. J. ["Defs.' Mot."] Ex. 19 ["Defs.' Appraisal Report"] at 1, ECF No. 156-21; see also Defs.' Mot. Ex. 18 ["Pl.'s Appraisal Report"] at 39, ECF No. 158-21).[2] The seven smaller plots are 2.019 acres, 2.008 acres, 2.005 acres, 3.243 acres, 3.905 acres, 2.371 acres, and 2.271 acres, respectively. (Defs.' Appraisal Report at 1). The larger remainder plot is 88.548 acres. (Id.).

The Camper family acquired the Property in 1969. (Pl.'s Appraisal Report at 4). Since then, the Property has been used for farming and for leasing residential rental properties. (Bryan Dep. 25:9–14; 52:4–15; 74:12–20, Feb. 15, 2018, ECF No. 158-7). In

---

[1] Unless otherwise noted, the facts outlined here are set forth in Clayland's Complaint in this case, (ECF No. 2), and Clayland's Complaint in, Clayland Farm Enterprises, LLC v. Talbot County, Maryland (Clayland II), No. JFM-15-2410 (D.Md. removed Aug. 13, 2015), ECF No. 2, which the Court consolidated with this case on May 5, 2017, (May 5, 2017 Order, ECF No. 62). To the extent the Court discusses facts that Clayland does not allege in its Complaints, they are uncontroverted and the Court views them in the light most favorable to the non-moving party. The Court will address additional facts when discussing applicable law.

[2] Clayland's appraisal report identifies only six smaller plots and one remainder plot, (Pl.'s Appraisal Report at 39), while Defendants' appraisal report identifies seven smaller plots and one remainder plot. This discrepancy, however, has no bearing on the resolution of any of Clayland's claims. Accordingly, for the sake of simplicity, the Court will describe the Property as containing seven smaller plots and one larger remainder plot.

1991, the Camper family received approval to build a six-lot development called "Darby Farm." (See Pl.'s Appraisal Report at 1; Defs.' Appraisal Report at ii, 22, 31).

In January 2002, Mrs. Camper passed away and left the Property to her children, Jeanne Bryan and John Camper, III (collectively, "the Campers").[3] (Pl.'s Appraisal Report at 4). The same month, the Campers elected to value the Property under Internal Revenue Service ("IRS") Special Use Valuation 2032A for the purposes of estate tax assessment.[4] (Id.). As a result, the IRS placed a $500,000.00 tax lien on the Property in exchange for the Campers agreeing to continue the agricultural use of the Property for ten years. (Id.). The IRS released the tax lien in January 2012. (Id. at 4, 105).

Also in 2002, the Campers established Clayland Farm Enterprises, LLC to oversee the Property. (Id. at 4). Clayland earns approximately $5,000.00 to $10,000.00 per year through sharecropping. (Bryan Dep. 144:14–146:17). Clayland also leases three residential properties on the Property, as well as an eight-acre nursery. (Id. 76:1–2; 149:19–150:2). Between 2006 and 2018, the rental properties have generated monthly rents of $1,050.00

---

[3] For simplicity's sake, the Court refers to Jeanne Bryan and John Camper, III as "the Campers"; it means no disrespect towards Ms. Bryan.

[4] Special Use Valuation 2032A requires that a qualified heir of an estate certify, among other things, that: (1) the decedent or a member of decedent's family was using 50% or more of the real property as a farm at the time of the decedent's death; (2) during the eight-year period leading up to the decedent's death, the decedent or a member of the decedent's family was using the real property as a farm for an aggregate of five years; and (3) he or she will use the real property as a farm for ten years following the decedent's death. 26 U.S.C. § 2032A (b)(1)(A)(i)–(ii), (C)(i)–(ii), (c)(1)(A)–(B) (2018). If the qualified heir sells any of his or her interest in the real property in the ten-year period or fails to use the real property as a farm for the full ten years, the IRS will impose an additional estate tax. 26 U.S.C. § 2032A(c)(1)(A)–(B). To secure repayment of the additional tax in case the qualifying heir fails to comply with § 2032A's provisions, the IRS places a tax lien on the real property. 26 CFR § 20.6324B-1 (2019).

to $1,340.00. (Id. 150:3–11). Clayland leases the nursery to a relative for $1.00 per year.[5] (Id. 149:10–13).

Prior to the inception of this suit, the Property was zoned as a "Village Center" zoning district; the Property was and still is designated an S-1 sewer service area. (Compl. ¶¶ 29, 36; Pl.'s Mot. Ex. 2, ECF No. 148-4; Pl.'s Mot. Ex. 7, ECF No. 149-1). Under Talbot County's 2005 Comprehensive Plan, which was in place at the start of this litigation, Village Center zoning districts were defined as areas of "low or moderate intensity residential communities," and were "the preferred location for single and multi-family residential development." (Compl. ¶¶ 30, 33). S-1 sewer service areas are "'served or to be served' by a system of sanitary sewer connected to a treatment plant." (Id. ¶ 36 (citing COMAR 26.03.01.01S)). With its Village Center and S-1 zoning, the Property could be developed for residential housing. (Id. ¶¶ 30, 33, 36). Clayland has not, however, taken any steps to begin developing the Property, including the approved development, Darby Farm.

### 2. Talbot County Planning & Zoning

#### a. Resolution 180

On March 22, 2011, Talbot County adopted Resolution 180, which became effective on May 24, 2011. (Pl.'s Mot. Ex. 16 ["Resolution 180"] at 7, ECF No. 149-10; see also Defs.' Resp. Opp'n Pl.'s Partial Mot. Summ. J. ["Defs.' Opp'n"] Ex. 11, ECF No. 158-12).

---

[5] Clayland is also applying to the County for approval of a cell tower on the Property, which would be leased for $950.00 a month. (Defs.' Opp'n Ex. 8, ECF No. 158-9).

Resolution 180 implemented a nine-month moratorium on "processing, consideration, review, or approval of any application" for a new subdivision received after March 22, 2011, in six Villages in Talbot County, including Royal Oak, the Village where the Property is located. (Resolution 180 at 2). The County enacted Resolution 180 to, among other things, allow sufficient time to "make the comprehensive sewer plan consistent with the comprehensive land-use plan." (Id. at 6). On January 10, 2012, the County extended Resolution 180 for an additional seventy days. (Pl.'s Mot. Ex. 20 ["Resolution 191"], ECF No. 149-14).

### b.      Bill No. 1229

In 2012, the Maryland General Assembly passed the Sustainable Growth and Agricultural Preservation Act (the "Septics Law"), which aimed to minimize the environmental impact of large subdivisions and the concomitant expansion of septic systems. (Compl. ¶ 8); Md. Code Ann., Land Use ["LU"] § 1-508 (West 2019). The Septics Law established a "four tier map designation system," (Compl. ¶ 9), and required local jurisdictions to adopt corollary growth tier maps, (id. ¶ 13). Pursuant to this mandate, Talbot County adopted Bill No. 1229 on December 11, 2012. (Id. ¶ 95; Pl.'s Mot. Ex. 24 ["Bill 1229"], ECF No. 150-3). Bill No. 1229 "classif[ied] land in the [C]ounty into one of seven tier classifications that establish[ed] the type of subdivision and the kind of wastewater treatment system planned for each subdivision type." (Compl. ¶ 83; Bill 1229

at 3–5). As a result, six acres of the Property were designated Tier III.B, and the remaining acres were designated Tier IV. (Compl. ¶ 84). [6]

### c. Comprehensive Plan Review

In 2013, the Maryland General Assembly amended laws regarding the timing of local planning commissions' review, and revision or amendment of, county comprehensive plans. 2013 Md. Laws ch. 520, 1; see also LU § 1-416. Prior to this amendment, local jurisdictions were required to review their comprehensive plans at least once every six years. 2012 Md. Laws ch. 426, 1. After this amendment, local jurisdictions were required to review their comprehensive plans at least once every ten years. See LU § 1-416. Talbot County initially anticipated revising its 2005 Comprehensive Plan in 2011. (Defs.' Suppl. Answer Interrogs. 4, ECF No. 158-5). As a result of the change in state law, however, Talbot County changed its target date for enacting a revised comprehensive plan to 2015. (Id.).

### d. Bill Nos. 1214 & 1257

On February 28, 2012, prior to the change in state law regarding the frequency of comprehensive plan review, Talbot County adopted Bill No. 1214. (Compl. ¶ 70; Pl.'s Mot. Ex. 22 ["Bill 1214"], ECF No. 150-1). Bill No. 1214 applied to all Village Center zoning districts within the County's twenty-two Villages. (Bill 1214 at 2). It reduced the

---

[6] The County later designated approximately 29.8 acres of the Property as Tier III.B. See Comprehensive Plan 2016, Talbot Cty. (Aug. 31, 2018, 12:51 PM), http://www.talbotcountymd.gov/index.php?page=Comprehensive_Plan [https://perma.cc/H7EZ-XDHB]. The Tier III.B portion of the Property includes Darby Farm, and retains its Village Center zoning designation. (Id.). The County designated the remaining 76 acres of the Property as Tier IV. (Id.).

permissible density of properties in Village Center zoning districts from four dwellings per acre to one dwelling per two acres, increased the minimum lot size from 10,000 square feet to one acre, and prohibited subdividing any existing parcel into more than one additional lot. (Bill 1214 at 2; Compl. ¶ 62). Bill No. 1214 was originally drafted to expire in three years but was subsequently amended to expire two years after its enactment. (Bill 1214 at 4; Compl. ¶¶ 63, 68).

On February 25, 2014, Talbot County approved Bill No. 1257. (Compl. ¶ 78; Pl.'s Mot. Ex. 28 ["Bill 1257"], ECF No. 150-7). Bill No. 1257 extended Bill No. 1214's restrictions until the "adoption of comprehensive rezoning and land use regulations regarding density in the [Village Center], VC1, and VC2 zoning districts pursuant to the County's comprehensive plan." (Bill 1257 at 3; Compl. ¶ 76).

### e. 2016 Comprehensive Plan & 2018 Comprehensive Rezoning

On June 7, 2016, Talbot County enacted its 2016 Comprehensive Plan. (Pl.'s Mot. Ex. 30 ["2016 Comprehensive Plan Excerpt"], ECF No. 150-9; Defs.' Opp'n Ex. 16 ["Bill No. 1329"], ECF No. 158-18). The 2016 Comprehensive Plan incorporated the tier map established in Bill No. 1229. (2016 Comprehensive Plan Excerpt at 3–4). On July 10, 2018, the County adopted Bill Nos. 1401 and 1402 (the "2018 Comprehensive Rezoning"), which were enacted sixty days later on September 11, 2018. Bill No. 1401 at 2 (repealing and replacing Chapter 190 of the Talbot County Code);[7] Bill No. 1401 Ex. A (Chapter 190 of

---

[7] A Bill to Repeal and Replace Talbot County Code Chapter 190, Entitled "Zoning, Subdivision, and Land Development," in its Entirety, and to Enact an Entire New Chapter 190 of the Talbot County Code to Implement Zoning Controls and Regulations Consistent with and Pursuant to the 2016 Talbot County Comprehensive Plan, Bill No. 1401, Cty.

the Talbot County Code);[8] Bill No. 1402 (Zoning Map Amendment).[9] These Bills implemented the comprehensive rezoning contemplated in the 2016 Comprehensive Plan, which became effective November 10, 2018. (Bill No. 1401 Ex. A at 1). Bill No. 1402 rezoned the Property from a Village Center zoning district to a Resource Conservation ("RC") zoning district. (See Bill No. 1402 at Map 40; see also Pl.'s Mot. at 6 n.3, 19).

## B. Procedural Background

On September 16, 2014, Clayland sued Defendants in the Circuit Court for Talbot County, Maryland (the "Original Complaint"). (ECF No. 2). On October 30, 2014, Defendants removed the case to this Court. (Not. of Removal ¶ 2, ECF No. 1). On April 30, 2015, this Court dismissed the Original Complaint on ripeness grounds. (Apr. 30, 2015 Order, ECF No. 22). The U.S. Court of Appeals for the Fourth Circuit reversed, holding that Clayland's claims were ripe. Clayland Farm Enters., LLC v. Talbot Cty., 672 F.App'x 240, 244–45 (4th Cir. 2016). While the appeal to the Fourth Circuit was pending, Clayland

---

Council of Talbot Cty., Md. (2018), http://www.talbotcountymd.gov/uploads/File/council/Bill%201401%20-%20Next%20Step%20190%20(Zoning%20Text)%20as%20amended,%20enacted,%20and%20enrolled.pdf [https://perma.cc/DVX9-RE2V].

[8] Next Step 190, Chapter 190 of the Talbot County Code (Sept. 11, 2018) http://www.talbotcountymd.gov/uploads/File/council/Bill%201401%20-%20Next%20Step%20190%20(Zoning%20Text%20Document),%20as%20amended,%20enacted%20and%20enrolled.pdf [https://perma.cc/CJ96-95AB].

[9] A Bill to Amend the Official Zoning Maps of Talbot County, Maryland (Specifically, Maps 1, 4, 5, 6, 10, 11, 12, 14, 16, 22, 24, 30, 31, 32, 33, 38, 39, 40, 40A, 41, 42, 43, 44, 44A, 45, 46, 47, 48, 49, 51, 55, and 56) and to Rezone the Affected Lands Consistent with the 2016 Talbot County Comprehensive Plan, Bill No. 1402, Cty. Council of Talbot Cty., Md. (July 10, 2018) http://www.talbotcountymd.gov/uploads/File/council/Bill%201402%20-%20Zoning%20Maps.pdf [https://perma.cc/3UJ6-6XEL].

filed a new lawsuit against the County and the Maryland Department of Planning (the "Second Complaint") in the Circuit Court for Talbot County, <u>Clayland Farm Enterprises, LLC v. Talbot County, Maryland</u> (<u>Clayland II</u>), No. JFM-15-2410, (D.Md. removed Aug. 13, 2015), which was removed to this Court, (<u>Clayland II</u>, ECF No. 1). On May 5, 2017, the Court consolidated the two cases. (<u>See</u> May 5, 2017 Order, ECF No. 62).

Clayland's Original Complaint alleges: Bill Nos. 1214 and 1257 constitute an unconstitutional taking of property in violation of the Fourteenth Amendment to the U.S. Constitution (Count I);[10] Bill Nos. 1214 and 1257 constitute a deprivation of procedural due process in violation of the Fourteenth Amendment (Count II); Bill Nos. 1214, 1257, and 1229 constitute a deprivation of substantive due process in violation of the Fourteenth Amendment (Count III); and a civil conspiracy to violate the constitutional rights secured by the Fourteenth Amendment (Count IV). (Compl. ¶¶ 123–59). The Original Complaint also seeks: a declaratory judgment that Bill No. 1229 is invalid under state law (Count V); a declaratory judgment that Bill Nos. 1214 and 1257 are invalid under state law (Count VI); and injunctive relief enjoining Bill Nos. 1214, 1229, and 1257 (Count VII). (<u>Id.</u> ¶¶ 160–80). Clayland brings its federal claims—Counts I, II, III, and IV—under 42 U.S.C. § 1983. (<u>Id.</u> ¶¶ 123–59).

Clayland's Second Complaint seeks: a declaratory judgment that Bill Nos. 1214 and 1257 are invalid under state law and under the Fourteenth Amendment (Count I); a

---

[10] The Court notes that Clayland brings its takings claim only under the Fourteenth Amendment, not the Fifth Amendment. (<u>See</u> Compl. at 26–29). Because the parties briefed Count I of the Original Complaint as though Clayland brought it under the Fifth Amendment, the Court applies Fifth Amendment case law to Clayland's claim.

declaratory judgment that Bill No. 1229 is invalid under state law (Count II); and an injunction against the enforcement of Bill Nos. 1214, 1229, 1257 (Count IV). (Compl., Clayland II, ["2d Compl."] ¶¶ 121–36, 145–50, ECF No. 2). The Second Complaint also alleges an inverse condemnation claim, asserting that Bill Nos. 1214 and 1257 constituted an impermissible taking of property under the Fifth Amendment, Article 24 of the Maryland Declaration of Rights, and § 40 of the Maryland Constitution (Count III). (Id. ¶¶ 137–44).

Clayland seeks equitable relief and monetary damages. (Compl. ¶¶ 133, 138, 149, 159, 165, 174, 180; 2d Compl. ¶¶ 130, 136, 144, 150).

On October 26, 2018, Clayland filed its Motion for Partial Summary Judgment. (ECF No. 148). On October 30, 2018, Defendants filed their Motion for Summary Judgment. (ECF No. 156). Defendants filed an Opposition to Clayland's Motion on November 8, 2018. (ECF No. 158). Clayland filed a combined Reply and Opposition to Defendants' Motion on November 13, 2018. (ECF No. 161). On December 14, 2018, Defendants filed a Reply. (ECF No. 167).

On June 4, 2019, the Court ordered the parties to submit supplemental briefing on: (1) whether Counts V, VI, and VII[11] are moot because the County's 2016 Comprehensive Plan and 2018 Comprehensive Rezoning appear to have superseded them; (2) if Bill Nos. 1214 and 1257 are characterized as legislative actions, what procedural due process rights apply to them; and (3) information on the plots of the Property that Bill Nos. 1214 and

---

[11] Unless otherwise indicated, the Court refers to the Counts in the Original Complaint.

1257 directly affected. (June 4, 2019 Order, ECF No. 169). On June 14, 2019, Clayland and Defendants filed their supplemental briefs. (ECF No. 170; ECF No. 171).

## II.     DISCUSSION

### A.     <u>Mootness</u>

A federal court may raise the issue of mootness <u>sua sponte</u> at any stage in the proceedings because it is a jurisdictional question. <u>United States v. Springer</u>, 715 F.3d 535, 540 (4th Cir. 2013) (citing <u>North Carolina v. Rice</u>, 404 U.S. 244, 246 (1971)). The mootness doctrine arises out of Article III of the U.S. Constitution and limits federal courts to deciding ongoing cases or controversies. U.S. Const. art III, § 2; <u>see</u> <u>Porter v. Clarke</u>, 852 F.3d 358, 363 (4th Cir. 2017). "A case is moot when it has 'lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law.'" <u>Md. Highways Contractors Ass'n, Inc. v. Maryland</u>, 933 F.2d 1246, 1249 (4th Cir. 1991) (citing <u>Diffenderfer v. Cent. Baptist Church of Miami, Inc.</u>, 404 U.S. 412, 414 (1972)). A controversy must remain live throughout the duration of the litigation. <u>Porter</u>, 852 F.3d at 363 (quoting <u>Arizonans for Official English v. Arizona</u>, 520 U.S. 43, 68 n.22 (1997)). "When a law no longer remains in effect, cases challenging that law and requesting only prospective equitable relief ordinarily become moot." <u>Cox v. Phillips</u>, No. 97-2207, 1998 WL 231229, at *2 (4th Cir. May 5, 1998) (first citing <u>Burke v. Barnes</u>, 479 U.S. 361, 363 (1987); and then citing <u>Diffenderfer</u>, 404 U.S. at 414); <u>see</u> <u>Jordahl v. Democratic Party of Virginia</u>, 122 F.3d 192, 198 (4th Cir. 1997); <u>Md. Highways</u>, 933 F.2d at 1249–50.

Here, Counts V, VI, and VII of the Original Complaint seek only prospective equitable relief. Count V seeks a declaratory judgment that Bill No. 1229 is void under Maryland law. Count VI seeks a declaratory judgment that Bill Nos. 1214 and 1257 are void under Maryland law. Count VII seeks injunctive relief, in part, against the enforcement of Bill Nos. 1214, 1257, and 1229. Talbot County's 2016 Comprehensive Plan and 2018 Comprehensive Rezoning superseded all three of these Bills. The declaratory judgments that Clayland seeks would, therefore, be impermissible advisory opinions. Md. Highways, 933 F.2d at 1249. Further, there would be no utility in enjoining statutes that are no longer in effect. See Kremens v. Bartley, 431 U.S. 119, 129 (1977) (concluding the enactment of a new statute "clearly moots the claims"); Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 911 F.2d 1331, 1335 (9th Cir. 1990) (holding that enactment of superseding legislation mooted claims for prospective equitable relief flowing from a moratorium on development).

Nevertheless, in its supplemental briefing, Clayland argues that Counts V, VI, and VII are not moot for three reasons. None of Clayland's arguments are persuasive.

First, Clayland argues that Count VI is not moot because Clayland could seek ancillary relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 (2018). But this argument puts the cart before the horse. Ancillary relief may flow from the Court's issuance of a declaratory judgment, but the Court must first determine that a declaratory judgment is appropriate. The Declaratory Judgment Act grants federal district courts discretion to entertain declaratory judgment actions. See Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995). The Act provides that district courts "may declare the rights and other legal

relations of any interested party seeking such declaration" provided that an "actual controversy" exists. § 2201(a); see also Icarom, PLC v. Howard Cty., 904 F.Supp. 454, 457 (D.Md. 1995). Here, Count VI no longer presents a live controversy because subsequent legislation superseded Bill Nos. 1214 and 1257. Cox, 1998 WL 231229, at *2. The Court, therefore, declines to issue what would amount to an advisory opinion on the validity of Bill Nos. 1214 and 1257.

Second, Clayland argues that Count VII is not moot because the Complaint requests equitable relief. Count VII requests, among other things, that Clayland be permitted to develop the Property under the zoning scheme as it existed prior to the County's adoption of Bill Nos. 1214 and 1257. As noted above, the passage of the 2016 Comprehensive Plan and 2018 Comprehensive Rezoning moots Clayland's claim for prospective equitable relief because the Bills it seeks to enjoin in Count VII—Bill Nos. 1214, 1257, and 1229—are no longer in force. Cox, 1998 WL 231229, at *2.

Third, Clayland argues that Count V is not moot because Bill No. 1229 was incorporated into the County's 2016 Comprehensive Plan with "minor corrections." (Pl.'s Supp. Br. at 4, ECF No. 170). But Clayland did not challenge the 2016 Comprehensive Plan in its Original Complaint or the Second Complaint and may not amend its pleadings through its briefs. Murray Energy Corp. v. Admin'r of Envtl. Prot. Agency, 861 F.3d 529, 537 n.5 (4th Cir. 2017) (quoting S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaint through briefing.")). Accordingly, the Court declines to consider this argument.

In short, the Court concludes that Counts V, VI, and VII are moot because the 2016 Comprehensive Plan and 2018 Comprehensive Rezoning superseded them.[12] Accordingly, the Court will dismiss these Counts for lack of subject-matter jurisdiction.[13]

## B.    Cross-Motions for Summary Judgment

### 1.    Standards of Review

#### a.    Rule 56

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers,

---

[12] For the same reasons Counts V, VI, and VII of the Original Complaint are moot, the Court further concludes that Counts I, II, and VI of the Second Complaint, which seek declaratory and injunctive relief, are also moot. Accordingly, the Court will dismiss these Counts for lack of subject-matter jurisdiction and deny as moot Defendants' Motion as to these Counts.

[13] The passage of superseding legislation does not moot claims that allege continuing harm and seek monetary damages. See McDoogal's East, Inc. v. Cty. Comm'rs of Caroline Cty., 341 F.App'x 918, 922 n.3 (4th Cir. 2009); Covenant Media of S.C., LLC v. City of North Charleston, 493 F.3d 421, 429 n.4 (4th Cir. 2007); see also Henson v. Honor Comm. of U. Va., 719 F.2d 69, 72 n.5 (4th Cir. 1983). Here, Counts I, II, III, and IV of the Original Complaint allege continuing harm from a facial regulatory taking, procedural due process violation, substantive due process violation, and civil conspiracy, respectively, and seek monetary damages. Accordingly, Counts I, II, III, and IV of the Original Complaint remain live controversies. In addition, to the extent that it seeks monetary damages, Count III of the Second Complaint also is not moot.

or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof,

"there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

### b. Cross-Motions for Summary Judgment

When the parties have filed cross-motions for summary judgment, the court must "review each motion separately on its own merits to 'determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). Moreover, "[w]hen considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." Id. (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)). The Court, however, must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993). If the evidence presented by the nonmovant is merely colorable, or is not significantly probative, summary judgment must be granted. Anderson, 477 U.S. at 249–50.

### 3. Analysis

Clayland asks the Court to grant summary judgment in its favor as to its facial regulatory takings claim and procedural due process claim, Counts I and II of the Original Complaint, and as to its state inverse condemnation claim, Count III of the Second Complaint. Defendants move for summary judgment in their favor on all of Clayland's Counts.

### a.      Facial Regulatory Takings Claim

Clayland argues that Bill Nos. 1214 and 1257 are illegitimate moratoria on development that constitute a facial regulatory taking. Defendants counter that Clayland cannot establish a facial regulatory taking because the Bills are permissible moratoria and they do not rise to the level of a taking.[14] The Court agrees with Defendants.

The Fifth Amendment to the U.S. Constitution "prohibits the taking of private property without just compensation." Pulte Home Corp. v. Montgomery Cty., 909 F.3d 685, 695 (4th Cir. 2018) (quoting Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 536 (2005)). The Takings Clause of the Fifth Amendment "'requires the payment of compensation whenever the government acquires private property for a public purpose,' but it does not address in specific terms the imposition of regulatory burdens on private property." Murr v. Wisconsin, 137 S.Ct. 1933, 1942 (2017) (quoting Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 321 (2002)). The U.S. Supreme Court has held, however, that "while property may be regulated to a certain

---

[14] Defendants also contend that Clayland must have a vested right to establish all of its constitutional claims, including its regulatory takings claim. Defendants are mistaken. Under Maryland law, a plaintiff only needs to have a vested right in an existing zoning use to be constitutionally protected against a subsequent change in a zoning ordinance prohibiting or limiting that use. A Helping Hand, LLC v. Baltimore Cty., 515 F.3d 356, 370–71 (4th Cir. 2008) (quoting Powell v. Calvert Cty., 795 A.2d 96, 102 (Md. 2002)). A plaintiff does not need to have a vested right, however, for a takings claim. See Pulte Home Corp. v. Montgomery Cty., 909 F.3d 685, 691–93, 695–97 (4th Cir. 2018) (conducting a facial regulatory takings analysis even though the court concluded that the landowner lacked a vested right in the unamended zoning ordinance). Further, the Bills at issue in this case did not alter the zoning designation for the Property, but rather placed temporary limitations on the density of development.

extent, if regulation goes too far it will be recognized as a taking." Id. (quoting Pa. Coal Co. v. Mahon, 260 U.S. 393, 415 (1922)).

The Supreme Court has identified two circumstances under which a regulation may go "too far." First, "with certain qualifications . . . a regulation which denies all economically beneficial or productive use of land will require compensation under the Takings Clause." Id. at 1942–43 (alteration in original) (internal quotation marks omitted) (quoting Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001)). Second, "when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found based on 'a complex of factors,'" known as the Penn Central[15] test. Id. at 1943. These factors include: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." Id. (citing Palazzolo, 533 U.S. at 617 (citing Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978))). In applying the Penn Central test, the Court focuses on "the parcel as a whole," Tahoe-Sierra, 535 U.S. at 326 (quoting Penn Cent., 438 U.S. at 130–31), and the first two factors—economic effects and investment-backed expectations—are "primary" among the Penn Central factors, see Lingle, 544 U.S. at 538–39. Because Clayland does not allege a total deprivation of all economically beneficial use, the Court will apply the Penn Central test.[16] See Clayland Farm, 672 F.App'x at 244.

---

[15] Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978).
[16] Neither Clayland nor Defendants dispute that the Penn Central test applies.

### i.    Economic effects

With regard to the first factor, Clayland puts forth evidence that Bill Nos. 1214 and 1257 resulted in a roughly 40% decrease[17] in the value of the Property. (See Pl.'s Appraisal Report at 70). As the Fourth Circuit has noted, courts have found no regulatory taking when presented with diminutions in value of 75% and 92.5%. Henry v. Jefferson Cty. Comm'n, 637 F.3d 269, 277 (4th Cir. 2011) (first citing Tenn. Scrap Recyclers Ass'n, LLC v. Bredesen, 556 F.3d 442, 456 & n.6 (6th Cir. 2009); and then citing Iowa Coal Mining Co., Inc. v. Monroe Cty., 257 F.3d 846, 853 (8th Cir. 2001)). Similarly, in Pulte, the Fourth Circuit held that a hypothetical 83% diminution in value was insufficient to establish a regulatory taking. 909 F.3d at 696. Moreover, Clayland can still build homes on the Property; Bill Nos. 1214 and 1257 only dictate that development on the Property be less dense than Clayland contemplated. This is not sufficient to establish a taking. See Quinn v. Bd. of Cty. Comm'rs for Queen Anne's Cty., 862 F.3d 433, 442 (4th Cir. 2017) ("A regulation is not a taking merely because it 'prohibit[s] the most beneficial use of the property.'" (alteration in original) (quoting Penn Cent., 438 U.S. at 125). Thus, the first factor weighs in Defendants' favor.

---

[17] Prior to the enactment of Bill Nos. 1214 and 1257, the Property was valued at $3,250,000.00. (Pl.'s Appraisal Report at 77). After the Bills' enactment, the Property was valued at $1,950,000.00, resulting in a diminution in value of $1,300,000.00. (Id.). Defendants' produce evidence of a much lower diminution in value—$125,000.00. (Defs.' Appraisal Report at ii). The Court notes that Clayland erroneously asserts that the Property was valued at $3,800,000.00 prior to the enactment of Bill Nos. 1214 and 1257 and that the Bills resulted in a "roughly 50%" diminution in value. (See Pl.'s Mot. at 34). In any event, this difference is not material, because, as the Court explains above, courts have held that diminutions in value of as much as 92.5% do not constitute a regulatory taking.

## ii.  Investment-backed expectations

As to the second factor, Defendants highlight that Clayland had not taken any steps to develop the Property. While this is not dispositive, see Tahoe-Sierra, 535 U.S. at 313 (noting that a portion of the petitioners had purchased their property with the intention to develop, but had not yet begun development), it weighs heavily against Clayland in the Penn Central analysis, see Lingle, 544 U.S. at 538–39. Clayland, for its part, asserts that "the Camper family invested in and reasonably expected to develop the Property in accordance with its zoning and other development rights." (Pl.'s Mot. at 33).[18] Clayland

---

[18] In making this argument, Clayland relies on an Affidavit from Ms. Bryan (the "Bryan Affidavit"). (Bryan Aff., ECF No. 149-9). Defendants contend that the Bryan Affidavit is a sham affidavit because she asserts that Clayland planned to develop the Property with "affordable housing." (Bryan Aff. ¶ 9). Specifically, Defendants maintain that this claim was never asserted in the Complaint, in Clayland's Answers to Interrogatories, by Bryan at her deposition, in Clayland's expert reports, or "in any prior pleading or submission of [Clayland] during the pendency of this four-plus years' long rolling lawsuit." (Defs.' Opp'n at 8). Clayland counters that the Bryan Affidavit and Ms. Bryan's deposition testimony are "obviously and indisputably consistent with each other." (Pl.'s Opp'n & Reply at 10 n.6, ECF No. 161).

Under the sham affidavit doctrine, a "party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." Ervin v. JP Morgan Chase Bank NA, No. GLR-13-2080, 2014 WL 4052895, at *2 (D.Md. Aug. 13, 2014) (quoting Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999)). "Application of the sham affidavit rule at the summary judgment stage 'must be carefully limited to situations involving flat contradictions of material fact.'" Zimmerman v. Novartis Pharm. Corp., 287 F.R.D. 357, 362 (D.Md. 2012) (quoting Mandengue v. ADT Sec. Sys., Inc., No. ELH–09–3103, 2012 WL 892621, at *18 (D.Md. Mar. 14, 2012)). The Court declines to apply the sham affidavit doctrine in this case. Although the Bryan Affidavit appears to be the first time Clayland asserts that it intended to develop affordable housing on the Property, this assertion merely specifies the type of residential development Clayland intended to pursue. Such an assertion is consistent with Clayland's general statements that it desired to residentially develop the Property. Further,

specifically notes that the Property was zoned Village Center, was in a priority funding area, and is within an S-1 sewer area. As a result, Clayland posits, it "had all necessary designations and rights for development to occur," which was an "inherently reasonable expectation." (Id.). The Court does not find Clayland's argument persuasive for at least three reasons.

First, Clayland's argument contemplates that the Property's zoning would not change. Yet, under state law, the County was tasked with reviewing and possibly revising its Comprehensive Plan—and enacting comprehensive rezoning in conformance with that plan—at least every six years and now every ten years. Indeed, the County had initially planned to propose a new Comprehensive Plan in 2011, but then changed its target date to 2015 due to a change in state law. Thus, conceivably, Clayland's zoning designation and concomitant development rights could have changed in 2011 had there not been a change in state law. It is therefore unreasonable for Clayland to expect that its zoning and development rights would remain unchanged.

Second, the evidence in the record reflects that Clayland did not take any steps to develop the Property. Indeed, the Campers agreed to continue using the Property as a farm for ten years—from 2002 to 2012—in exchange for reduced federal estate tax liability. As part of receiving this benefit, the Campers had to establish that the Property had been used as a farm for five out of the eight years leading up to their mother's death and certify that they would continue to use the Property as a farm for ten years after their mother's death.

_____

the particular type of development Clayland wants to pursue is immaterial to the Court's analysis in this case.

See 26 U.S.C. § 2032A (b)(1)(C)(i)–(ii), (c)(1)(A)–(B). Further, the County approved the six-plot subdivision in 1991—almost thirty years ago—but neither the Camper family nor Clayland has taken any steps to develop the plots. These facts undercut Clayland's assertions that the Camper family, and later Clayland, expected to develop the Property as a residential subdivision.

Third, to the extent Clayland argues that it has an entitlement to develop the Property based on its Village Center zoning, S-1 sewer, and priority funding area designations, the Fourth Circuit has rejected this idea. See, e.g., Quinn, 862 F.3d at 442–43 ("Any hope of developing the land thus depended on receiving sewer service—a speculative proposition and one to which . . . [the plaintiff] had no entitlement."); Henry, 637 F.3d at 277 (rejecting the plaintiff's argument that it had reasonable investment-backed expectations in a higher density conditional use permit than what the defendant granted him because he had no entitlement to such a permit); see also Neifert v. Dep't of Env't, 910 A.2d 1100, 1122 (Md. 2006) (noting that there is no state or federal constitutional right to sewer service). Further, Clayland has no right to the most economically beneficial use of the Property. See Henry, 637 F.3d at 277 ("We . . . see no warrant for requiring the Planning Commission to exercise its discretion so as to most profit [the plaintiff].").

The Court's consideration of the impact of Bill Nos. 1214 and 1257 on Clayland's investment-backed expectations, therefore, weighs in Defendants' favor.

### iii.    Character of the government action

Moratoria are "interim controls on the use of land that seek to maintain the status quo with respect to land development in an area by either 'freezing' existing land uses or

by allowing the issuance of building permits for only certain land uses that would not be inconsistent with a contemplated zoning plan or zoning change." Tahoe-Sierra, 535 U.S. at 352–53 (Rehnquist, J., dissenting) (quoting E. Ziegler, Rathkopf's The Law of Zoning and Planning § 13:3 (4th ed. 2001)). Moratoria, when reasonable, are "essential tool[s] of successful development." Id. at 338 (majority). Courts routinely uphold moratoria that persist for reasonable lengths of time and serve legitimate public purposes. See, e.g., First English Evangelical Lutheran Church v. County of Los Angeles, 258 Cal.Rptr. 893, 906 (Cal.Ct.App. 1989) (upholding the constitutionality of a two-and-a-half-year moratorium on development while county conducted study to determine where structures could safely be built on floodplain); S.E.W. Friel v. Triangle Oil Co., 543 A.2d 863, 866–67 (Md.Ct.Spec.App. 1988) (concluding nine-month moratorium on development while county developed new land use regulations was not a taking); Tocco v. N.J. Council on Affordable Hous., 576 A.2d 328, 330 (N.J.Super.Ct.App.Div. 1990) (upholding the constitutionality of an eighteen-month freeze on the development of plots of land that are two acres or larger while the municipality developed a plan for the construction of affordable housing).[19]

---

[19] The Court notes that most of the cases addressing whether a moratorium constituted a taking are from state court because, until just recently, property owners had to exhaust all state remedies before bringing a takings claim in federal court. See Knick v. Twp. of Scott, 139 S.Ct. 2162, 2167 (2019) ("We now conclude that the state-litigation requirement imposes an unjustifiable burden on takings plaintiffs, conflicts with the rest of our takings jurisprudence, and must be overruled. A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it."; overruling Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172 (1985)).

But when moratoria persist for long periods of time or serve no compelling purpose, courts have viewed them with skepticism or found them invalid. See, e.g., Md.-Nat'l Capital Park & Planning Comm'n v. Chadwick, 405 A.2d 241, 250 (Md. 1979) (holding that ordinance that placed litigant's land in reservation for up to three years "without any reasonable uses permitted" was a taking); Deal Gardens, Inc. v. Bd. of Trs. of Vill. of Loch Arbor, 226 A.2d 607, 612 (N.J. 1967) (holding that an open-ended moratorium with no end date was invalid, and that the two years that had already elapsed should have been sufficient to allow the municipality to develop a permanent zoning ordinance); Mitchell v. Kemp, 575 N.Y.S.2d 337, 338 (N.Y.App.Div. 1991) (concluding that a moratorium was unconstitutional because the town "failed to offer any satisfactory reasons for the nearly five-year delay in enacting a zoning ordinance"); Land Master Montg I, LLC v. Town of Montgomery, 821 N.Y.S.2d 432, at *10 (N.Y.Sup.Ct. 2006) ("[T]he Court finds the successive continuation of this moratorium for a period of some two and one-half years to be disturbing . . . ."); Schoeller v. Bd. of Cty. Comm'rs of Park Cty., 568 P.2d 869, 874, 878–79 (Wyo. 1977) (invalidating five-year moratorium on development in the lead-up to adoption of a new comprehensive plan); cf. Steel v. Cape Corp., 677 A.2d 634, 652 (Md.Ct.Spec.App. 1996) (holding that six-year delay in rezoning an individual's property was an as-applied taking).

The County argues that Bill Nos. 1214 and 1257 were necessary to forestall development that might undercut its comprehensive plan and attendant rezoning. While this is a reasonable purpose for a short period, the legitimacy of the Bills is undercut, to some extent, by both their duration and the circumstances that gave rise to the Bills'

adoption. The Bills were in place from February 28, 2012 through November 10, 2018. By any measure, six years is a long period of time to forestall development in the lead-up to a zoning change.[20] This is especially true because the sole justification the County has provided for the delay is that it needed time to develop its comprehensive plan and comprehensive rezoning, and that its planning was derailed by a change in Maryland law, which required a review of the County's comprehensive plan every ten years instead of every six years. By way of comparison, courts have upheld prolonged moratoria when local governments needed time to craft a new zoning plan to address pressing public safety concerns, see First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty., 482 U.S. 304, 328 n.6 (1987); First English, 258 Cal.Rptr. at 906, or to conduct complex, interstate scientific studies, see Tahoe-Sierra, 535 U.S. at 307. The public import of the County's justification in this case falls far short of these precedents.

The Court's concerns with the County's justification deepen upon closer inspection. Talbot County, by its own admission, was already in the process of developing a comprehensive plan and comprehensive rezoning when state law changed and moved the County's target date from 2011 to 2016. The state law reads: "[a]t least once every ten years, each planning commission shall review the comprehensive plan and, if necessary, revise or amend the comprehensive plan." LU § 1-416. The County has not explained why

---

[20] The delay, in fact, was longer. Prior to the passage of Bill Nos. 1214 and 1257, Resolution 180 banned all development for nine months, and the County extended Resolution 180 for an additional seventy days. But Clayland does not challenge Resolution 180. Accordingly, the Court's analysis focuses solely on the six-year period during which Bill Nos. 1214 and 1257 were in place.

it reads this statute as allowing for a review of the County's comprehensive plan <u>only once</u> every ten years, as opposed to <u>at least once</u> every ten years. But if, as the County suggests, LU § 1-416 was intended to prevent review of the County's comprehensive plan until 2016, the County's decision to impose a six-year moratorium is troubling. In changing the timeline for review of and modification to the comprehensive plan from every six to every ten years, LU § 1-416 implicitly granted landowners greater stability and security in the existing zoning scheme. Rather than acknowledging this change in state law that granted landowners four additional years to develop their land under the existing zoning scheme, Bill Nos. 1214 and 1257 effected a workaround that prevented development that would be inconsistent with the County's forthcoming 2016 Comprehensive Plan.

In brief, both the length of moratoria and the unconvincing justifications Defendants provide concern the Court. But <u>Penn Central</u> demands a holistic review of not only the nature of the government action, but also the economic impact of the regulation on affected landowners and their investment-backed expectations, <u>Penn Cent.</u>, 438 U.S. at 124, which are the primary factors in the analysis, <u>see</u> <u>Lingle</u>, 544 U.S. at 538–39. While undoubtedly restricting development potential, Bill Nos. 1214 and 1257 were not wholesale prohibitions on development. Clayland continued to enjoy preexisting economic uses of its land and could have subdivided its remainder plot and developed one new plot of land.

Further, the Court is loath to wade into land disputes, which fall squarely within the purview of local zoning authorities. <u>See</u> <u>Pulte</u>, 909 F.3d at 696 (noting that "'[m]anaging the density of development—even if it disappoints a particular developer—is a crucial goal of land use planning' and generally does not amount to a taking" (alteration in original)

(quoting <u>Quinn</u>, 862 F.3d at 441)). Defining the contours of acceptable moratoria is particularly tricky given the legitimate state interests at stake, and the legislature, not the Court, is best suited to the task.[21]

Thus, based on the facts in the record, Clayland fails to establish that the harm it suffered due to Bill Nos. 1214 and 1257 rises to the level of a cognizable facial regulatory taking. Accordingly, the Court will deny Clayland's Motion as to Count I and grant Defendants' Motion as to Count I.

### b. Procedural Due Process Claim

Clayland alleges that Bill Nos. 1214 and 1257 violated its procedural due process rights because they were enacted without adequate post-deprivation remedies and because the Bills targeted Clayland. Defendants counter that: (1) the bills were legislative in nature; (2) Clayland has not identified a protected property interest; and (3) the public hearings that preceded the adoption of the Bills satisfied any constitutional due process requirements. The Court agrees with Defendants that Bill Nos. 1214 and 1257 were legislative in nature, and, as a result, they do not give rise to procedural due process rights.

Legislative acts generally include the "adopt[ion of] prospective" rules and the creation of general policies that "affect[ ]the larger population." <u>E.E.O.C. v. Washington Suburban Sanitary Comm'n</u>, 631 F.3d 174, 184 (4th Cir. 2011) (first alteration in original) (quoting <u>Alexander v. Holden</u>, 66 F.3d 62, 66–67 (4th Cir. 1995)). Legislative acts do not give rise to procedural due process rights. <u>See</u> <u>Bi-Metallic Inv. Co. v. State Bd. of</u>

---

[21] Several states set time limits on moratoria. <u>See</u> <u>Tahoe-Sierra</u>, 535 U.S. at 342 n.37 (detailing state legislative efforts to limit the length of moratoria).

Equalization, 239 U.S. 441, 445 (1915); Barefoot v. City of Wilmington, 306 F.3d 113, 124 (4th Cir. 2002) ("When a legislature passes a law which affects a general class of persons, the political process provides all the process that is due."), abrogated on other grounds as recognized in Davani v. Va. Dep't of Transp., 434 F.3d 712 (4th Cir. 2006); Richardson v. Town of Eastover, 922 F.2d 1152, 1158 (4th Cir. 1991) ("[I]f a town's action is legislative, an affected party has no right to notice and an opportunity to be heard."). Adjudicative acts, by contrast, "affect specific individuals rather than formulate broad public policy." Washington Suburban, 631 F.3d at 184 (citing Alexander, 66 F.3d at 66). As a result, adjudicative acts give rise to procedural due process rights.

Here, neither Clayland nor Defendants dispute that Bill Nos. 1214 and 1257 were legislative in nature. Bill Nos. 1214 and 1257 applied broadly, affecting all properties zoned Village Center within Talbot County's twenty-two Villages. Nevertheless, Clayland argues that Bill Nos. 1214 and 1257 targeted the Property and, therefore, it is entitled to procedural due process. The Court is not persuaded.

The Court has identified only one case in which the Fourth Circuit conducted a procedural due process analysis when a litigant argued that an amendment to a county's master zoning plan targeted his property. See Pulte, 909 F.3d at 685. But Clayland's procedural due process argument is narrower than the claim in Pulte. Clayland alleges solely that its procedural due process rights were violated because Bill Nos. 1214 and 1257 were passed without any post-deprivation remedies. Specifically, because neither Bill provided for variances or special exceptions, Clayland argues its only avenue for relief from the Bills was through the courts. In supplemental briefing, Clayland clarified that its

procedural due process claim is pled in the alternative to its takings claim. Citing <u>Presley v. City of Charlottesville</u>, 464 F.3d 480 (4th Cir. 2006), Clayland argues that if the Court rejects its takings claim, it has a viable procedural due process claim to recoup damages that it suffered in the wake of Bill Nos. 1214 and 1257. But this argument presupposes that Clayland has in fact suffered cognizable damages as either a regulatory taking or a violation of procedural due process. In fact, as the Court explains below, all the process that Clayland is due is the opportunity to litigate its claims in court.

Presley dealt with a physical taking and held that an "inverse condemnation action for just compensation . . . provides all the process" a litigant is due. <u>Id.</u> at 489. Analogously, a regulatory takings action provides all the process Clayland is due in the wake of the passage of Bill Nos. 1214 and 1257. Clayland has spent close to five years litigating its takings claim. Both this Court and the Fourth Circuit have weighed in. It strains credulity to suggest that, despite these years of litigation and the inherently legislative nature of Bill Nos. 1214 and 1257, Clayland has nonetheless been denied procedural due process protections. <u>See</u> <u>Henry</u> 637 F.3d at 278–79 (expressing skepticism that plaintiff was denied procedural due process "[a]fter years and years of litigation").

Thus, there are no genuine disputes of material fact, and as a matter of law, neither Bill No. 1214 nor Bill No. 1257 violated Clayland's procedural due process rights. Accordingly, the Court will deny Clayland's Motion as to Count II and grant Defendants' Motion as to Count II.[22]

---

[22] Clayland and Defendants also move for summary judgment as to Count III of the Second Complaint. Clayland alleges that Defendants violated both Article 24 of the

### c.     Substantive Due Process Claim

Defendants move for summary judgment on Clayland's substantive due process claim. Defendants argue that Bill Nos. 1214, 1257, and 1229 were rationally related to legitimate County purposes and fell far short of violating Clayland's substantive due process rights. Clayland counters that Defendants violated their substantive due process rights because the challenged bills had no legitimate purpose and targeted the Property.[23] The Court agrees with Defendants.

---

Maryland Declaration of Rights and § 40 of the Maryland Constitution. Article 24 is interpreted in pari materia with the Fourteenth Amendment to the U.S. Constitution. Tyler v. City of College Park, 3 A.3d 421, 435 (Md. 2010); see also B.N.S. by Stuart v. Brito, No. ELH-17-2670, 2018 WL 5830565, at *8–9 (D.Md. Nov. 6, 2018); Meyers v. Baltimore Cty., 981 F.Supp.2d 422, 430 (D.Md. 2013). Similarly, § 40 has the "same meaning and effect in reference to an exaction of property," and "decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities" for its interpretation. Litz v. Md. Dep't of Env't, 131 A.3d 923, 930 (Md. 2016) (citing Bureau of Mines of Md. v. George's Creek Coal & Land Co., 321 A.2d 748, 755 (1974)). Accordingly, because the Court has concluded that Clayland fails to establish both a procedural due process violation and a facial regulatory taking, the Court will deny Clayland's Motion and grant Defendants' Motion as to Count III of the Second Complaint.

[23] Clayland contends that Bill Nos. 1214 and 1257 had an "invalid and arbitrary purpose" as "de facto and unlawful downzoning" of the Property that was in place until the County could legally downzone the Property. (Pl.'s Mot. at 18–19). In support of its argument, Clayland relies on Requests for Admissions that it sent to Defendants which they refused to answer and, as a result, Clayland considers admitted. Defendants move to strike the Requests for Admissions because they were not timely served and, therefore, Defendants declined to respond to them. Because a motion to strike may only "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter," Fed.R.Civ.P. 12(f) (emphasis added), the Court construes Defendants' motion as a motion to withdraw, see Fed.R.Civ.P. 36(b) ("A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended.").

Here, the deadline for serving Requests for Admissions was July 9, 2018. (Apr. 3, 2018 Mem. Op. at 14, ECF No. 121). On July 18, 2018, the USMJ assigned to handle discovery in this case extended the discovery deadline to August 31, 2018 to take two additional depositions. (July 19, 2018 Order at 4–5, ECF No. 137). Clayland served

To establish a substantive due process violation, a plaintiff must demonstrate: "(1) that [he] had property or a property interest; (2) that the state deprived [him] of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that <u>no process</u> could cure the deficiency." <u>Quinn</u>, 862 F.3d at 443 (quoting <u>Sylvia Dev. Corp. v. Calvert Cty.</u>, 48 F.3d 810, 827 (4th Cir. 1995)). In the zoning context, substantive due process claims face "significant hurdles" because of the court's "oft-repeated extreme[] reluctan[ce] to upset the delicate political balance at play in local land-use disputes." <u>Id.</u> (alterations in original) (internal quotation marks omitted) (quoting <u>Henry</u>, 637 F.3d at 278). Consequently, a plaintiff only succeeds on a substantive due process claim if "the alleged purpose behind the state action has no conceivable rational relationship to the exercise of the state's traditional police power through zoning." <u>Sylvia</u>, 48 F.3d at 827; <u>see</u> <u>MLC Auto., LLC v. Town of S. Pines</u>, 532 F.3d 269, 281 (4th Cir. 2008) ("[I]n the context of a zoning action involving property, it must be clear that the state's action 'has no foundation in reason and is a mere arbitrary or irrational exercise of

---

Defendants with Requests for Admissions (the "Requests") on July 30, 2018. (Pl.'s Mot. Ex. 5 at 6, ECF No. 148-7). Because the discovery deadline had passed, defense counsel informed Clayland's counsel that Defendants were not going to respond to the Requests. (Defs.' Opp'n Ex. 17A at 2, ECF No. 158-20). Clayland, for its part, maintains that the Requests were timely because it served them on Defendants thirty days before the August 31, 2018 discovery deadline. Clayland misinterprets the USMJ's July 18, 2018 Order. The Order states that Clayland "anticipates taking up to two additional fact depositions of third[-]party witnesses and is coordinating dates for those depositions to take place as soon as practicable. The discovery deadline is extended until August 31, 2018 <u>to accommodate those</u>." (July 19, 2018 Order at 5) (emphasis added). Thus, the USMJ extended the discovery deadline for the sole purpose of taking two depositions; the USMJ did not extend the deadline for all discovery. Accordingly, because Clayland served the Requests on Defendants after the discovery deadline had passed, the Court declines to deem them admitted and will withdraw them.

power having no substantial relation to the public health . . . [or] public safety.'" (quoting Nectow v. City of Cambridge, 277 U.S. 183, 187–88 (1928))).

To assess whether a zoning decision meets this exacting standard, the Court may consider whether: "(1) the zoning decision is tainted with fundamental procedural irregularity; (2) the action is targeted at a single party; and (3) the action deviates from or is inconsistent with regular practice." MLC Auto., 532 F.3d at 281 (citing A Helping Hand, 515 F.3d at 373 n.10). In conducting this analysis, the Court bears in mind that the Fourth Circuit has emphasized that violations of state law often do not rise to the level of a substantive due process violation. Sylvia, 48 F.3d at 829 ("[T]he legality of a zoning decision under applicable state law is not determinative of whether the decision violated federal substantive due process.").

Here, Bill Nos. 1214, 1257, and 1229 conceivably had rational relationships to the County's exercise of its traditional zoning powers. Bill Nos. 1214 and 1257 were enacted to ensure that a rush to development under the preexisting zoning scheme did not undercut the County's 2016 Comprehensive Plan and concomitant rezoning. The Court acknowledges its concern with the duration of Bill Nos. 1214 and 1257 and the justifications the County offered for a six-year delay in enacting comprehensive rezoning. But, establishing a substantive due process violation in the zoning context is exceedingly difficult, and the moratoria were reasonably related to the County's exercise of its zoning powers. The Court, therefore, cannot conclude that Bill Nos. 1214 and 1257 had "no conceivable rational relationship" to the County's exercise of its zoning powers. Sylvia, 48 F.3d at 827.

Similarly, the County enacted Bill No. 1229 to comply with Maryland's Septics Law. Bill No. 1229 mirrored the growth tier map the Septics Law established. Clayland takes issue with its tier designation, but this dispute does not cast doubt on the rational relationship between Bill No. 1229 and the County's exercise of its traditional zoning powers, or the County's mandate under the Septics Law. Defendants provide a reasonable explanation for Clayland's tier designation: the Property did not fit neatly into any of the tiers the Septics Law established. The County, therefore, slotted the Property in the tiers that most closely aligned with the Septics Law's framework and the impending 2016 Comprehensive Plan. Defendants also identified multiple comparable properties that received the same tier designation as the Property. (Defs.' Opp'n at 16–17; id. Exs. 4, 14, 15). Thus, like Bill Nos. 1214 and 1257, the Court cannot conclude that Bill No. 1229 had "no conceivable rational relationship" to the County's zoning powers. Sylvia, 48 F.3d at 827.

Clayland also argues that the Bills rose to the level of a substantive due process violation because they targeted the Property. In support of this argument, Clayland points to statements made during the public hearings that preceded the enactment of Bill Nos. 1214 and 1257 which suggested that the County was predominantly concerned with the development of large parcels of land. There is no evidence in the record, however, that by "large parcels" the County meant the Property. Even assuming this were the case, the Fourth Circuit has explained that: "[a] single [property] may provide the impetus for a general zoning enactment, but that does not mean the enactment is aimed solely at that [property]." Siena Corp. v. Mayor of Rockville, 873 F.3d 456, 464 (4th Cir. 2017). A

zoning enactment is not targeted so long as it applies to all similarly zoned properties. Id. Here, Bill Nos. 1214 and 1257 applied to all properties zoned Village Center in County's villages, and Clayland does not point to any other evidence that the Bills targeted the Property.

In sum, the Court concludes that there is no genuine dispute of material fact Bill Nos. 1214, 1257, and 1229 were rationally related to the County's exercise of its traditional zoning powers and did not target the Property. Accordingly, the Court will grant Defendants' Motion as to Count III of the Original Complaint.

### d.    Civil Conspiracy Claim

Defendants advance four arguments for dismissing Clayland's civil conspiracy claim: (1) all of Clayland's § 1983 claims fail, and therefore, Clayland cannot establish a civil conspiracy as a matter of law; (2) the intracorporate conspiracy doctrine bars Clayland's claims; (3) the individual Defendants are entitled to qualified immunity; and (4) the Talbot County Planning Commission and the Advisory Board are not legal entities distinct from Talbot County, and therefore cannot be sued. Clayland counters that: (1) summary judgment is premature because under the supervision of a United States Magistrate Judge, the parties agreed to postpone all discovery on Count IV until a later date; (2) the intracorporate conspiracy doctrine does not apply; and (3) County agencies are routinely sued under § 1983. The Court agrees with Defendants' first argument.

To establish a civil conspiracy under § 1983, the plaintiff must establish: (1) that the defendants "acted jointly in concert"; and (2) that "some overt act was done in furtherance of the conspiracy which resulted in [the plaintiff's] deprivation of a constitutional right."

Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996). Here, because Clayland fails to establish any of its underlying constitutional claims, it cannot prove a civil conspiracy under § 1983. Accordingly, the Court will grant Defendants' Motion as to Count IV.

### III.    CONCLUSION

For the foregoing reasons, the Court will deny Clayland's Motion for Partial Summary Judgment (ECF No. 148) and grant in part and deny as moot in part Defendants' Motion for Summary Judgment (ECF No. 156). The Court will also dismiss as moot Counts V, VI, and VII of the Original Complaint and Counts I, II, and IV of the Second Complaint. A separate order follows.

Entered this 29th day of August, 2019.            _____/s/_____
                                                  George L. Russell, III
                                                  United States District Judge